### FOX NEWS NETWORK, LLC, Plaintiff,

v.

### UNITED STATES DEPARTMENT OF THE TREASURY, Defendant.

No. 08 Civ. 11009(RJH)(FM).

United States District Court, S.D. New York.

Dec. 4, 2009.

---

Steven Glen Mintz, Terence William McCormick, Paul Ostensen, Mintz & Gold LLP, NYC, NY, for Plaintiff.

Danna Drori, U.S. Attorney's Office, New York, NY, for Defendant.

## ORDER

FRANK MAAS, United States Magistrate Judge.

Plaintiff Fox News Network, LLC ("Fox") brings this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel defendant United States Department of the Treasury ("Treasury") to produce certain documents concerning (a) the use of Troubled Asset Relief Program ("TARP") funds to assist American Insurance Group ("AIG") and Citigroup ("Citi"), and (b) Treasury's custodianship agreement with the Bank of New York Mellon ("BONY"). The case comes before the Court on cross-motions for summary judgment, which the assigned District Judge, the Honorable Richard J. Holwell, has referred to me for a Report and Recommendation. (See Docket Nos. 39, 44, 55). For the reasons set forth below, I conclude that Treasury's Vaughn index is inadequate in certain respects.[1] Accordingly, Treasury will be required to supplement its index before the Court further considers the cross-motions.

Fox made the FOIA requests that are the subject of this suit in November and December 2008. (See Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. and in Supp. of Cross–Mot. (Docket No. 44) [hereinafter Fox Mem.] at 9–10). The November request sought information "generated after July 1, 2008 relating to the BONY Custodian Agreement" and "rec-

ords relating to funds paid to and assets acquired from AIG pursuant to TARP, as well as records pertaining to the terms of any TARP-related transactions with AIG, including executive compensation, oversight procedures, and pledged collateral." (Id. at 10). The December request sought documents "regarding data collected on the effects of TARP spending on the availability of consumer credit in the United States, as well as the availability of credit for small businesses," and "records of TARP assistance to Citigroup." (Id.).

In response to these requests, Treasury produced 6,000 pages of materials in full and another 4,000 pages containing redactions, but withheld 3,330 pages of documents pursuant to various FOIA exemptions. (See Mem. of Law in Supp. of Treasury's Mot. for Summ. J. (Docket No. 39) [hereinafter Treasury Mem.] at 2). After Fox provided Treasury with a list of approximately 330 documents whose exemptions it disputed, Treasury made a primarily discretionary release of all or part of 75 additional documents. (Id.). Treasury then moved, and Fox cross-moved, for summary judgment. (See Docket Nos. 39, 44).

"In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994). The agency can meet this burden through affidavits and declarations "giving reasonably detailed explanations why any

1. In Vaughn v. Rosen, 484 F.2d 820, 826–28 (D.C.Cir.1973), the Court of Appeals for the District of Columbia Circuit concluded that the government could meet its obligations under FOIA by submitting an index containing detailed descriptions of any documents redacted or withheld. In doing so, the court relied on the Supreme Court's suggestion in

Environmental Protection Agency v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), that in camera review is not necessary in every instance. See id. at 93, 93 S.Ct. 827 ("Plainly, in some situations, in camera inspection will be necessary and appropriate. But it need not be automatic.").

withheld documents fall within an exemption." *Id.* Typically the agency will submit a Vaughn index containing descriptions of the withheld documents, along with affidavits or declarations from relevant individuals. If the agency's submissions are adequate on their face, the district court may "forgo discovery and award summary judgment," unless the plaintiff makes a showing of bad faith sufficient to impugn the agency's declarations, provides tangible evidence that an exemption claimed should not apply, or shows that summary judgment is otherwise inappropriate. *Id.* (quoting *Goland v. CIA,* 607 F.2d 339, 352 (D.C.Cir.1978)).

In this case, Treasury has described its document search in sufficient detail for the Court to determine its adequacy. One area of concern its description raises, however, is the conceded failure of any office at Treasury other than the Office of Financial Stability to use the search term "BONY" to locate responsive electronic documents. (*See* Fox Mem. at 14). Treasury seeks to justify this omission on the basis that Fox's request referred to the "Bank of New York Mellon," rather than "BONY." (*See* Treasury Mem. at 11). A FOIA request and appropriate search terms, however, will rarely be coterminous. Accordingly, unless Treasury is able to justify its failure to search for documents containing the acronym "BONY" by December 11, 2009, the Court will require that such a search be undertaken.

Turning to the second required showing, in certain instances Treasury has furnished the Court with enough detail for it to determine whether the exemptions claimed in fact apply. In other instances Treasury has made extensive use of what Fox correctly refers to as "boilerplate" language, which lacks the detail necessary for the Court to determine, based solely on the *Vaughn* index, whether an exemption has properly been claimed as to a particular document. (*See id.* at 2). The use of this boilerplate is somewhat understandable given the initial burden of producing descriptions of more than 7,000 pages of documents that Treasury either redacted or withheld in full. At this juncture, however, the universe of disputed documents has been greatly reduced. Treasury therefore needs to provide the Court with further information about the remaining documents. *See Grand Cent. P'ship v. Cuomo,* 166 F.3d 473, 481 (2d Cir.1999) (finding *Vaughn* index and supplemental affidavits inadequate, but remanding "for further development of the record in the form of affidavits by the actual authors of these documents").

In an effort to expedite and inform the process of revising the Treasury index, I have summarized below the applicable case law and the respects in which Treasury's descriptions appear to be inadequate. Only two of the exemptions claimed require discussion.

*Exemption 5*

█ Treasury has withheld the bulk of the documents pursuant to the so-called "deliberative process" privilege under 5 U.S.C. § 552(b)(5) ("Exemption 5"). That privilege, which is intended to encourage candor in agency decision making, excludes from release documents that reflect policies that an agency did not adopt or rationales for policies actually adopted upon which the agency ultimately decided not to rely. *See Tigue v. U.S. Dep't of Justice,* 312 F.3d 70, 76 (2d Cir.2002) ("The rationale behind this privilege is 'the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news ....' ") (quoting *Dep't of the Interior and Bureau of Indian Affairs v. Klamath Water Users Protective*

*Ass'n*, 532 U.S. 1, 8–9, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001)). In order for the privilege to apply, a document must be either intra- or inter-agency, predecisional, and deliberative. *Id.* Although Fox disputes whether certain documents exchanged between Treasury and the New York Federal Reserve Bank ("NYFRB") can properly be characterized as "intra-agency," the Court has sufficient information to resolve that question. The additional information that the Court needs relates to the two other elements that must be satisfied before Treasury can withhold a document under Exemption 5.

 To be "predecisional," a document must be prepared to "assist an agency decisionmaker in arriving at his decision." *Grand Cent. P'ship*, 166 F.3d at 482. Thus, "[t]he privilege protects recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinion of the writer rather than the policy of the agency." *Id.* (quoting *Ethyl Corp. v. U.S. Envtl. Prot. Agency*, 25 F.3d 1241, 1248 (4th Cir.1994)) (internal quotation marks omitted). In determining whether a given document is predecisional, courts have considered whether the agency can "pinpoint the specific agency decision to which the document correlates ... and ... verify that the document precedes, in temporal sequence, the 'decision' to which it relates." *Id.* (quoting *Providence Journal Co. v. U.S. Dep't of the Army*, 981 F.2d 552, 557 (1st Cir.1992)). Courts also have looked to the identity and position of the authors and recipients of documents because those that are drafted for superiors or decision makers are more likely to be predecisional. *Id.*

 Treasury's index lacks two categories of information related to the allegedly predecisional nature of its documents. First, the authors and recipients frequent-ly are not identified, and, even when they are identified, it often is unclear what their respective positions are in the decisional hierarchy. Other courts have considered such information critical. *See, e.g., Ethyl Corp.*, 25 F.3d at 1250 ("[W]here the list fails to identify either the author or its recipient, those persons' relationships to the decisionmaking process cannot be identified and it becomes difficult, if not impossible, to perceive how the disclosure of [the] documents would result in a chilling effect upon the open and frank exchange of opinions within the agency."). In some instances it may be necessary to separate documents currently labeled as "email strings" into individual emails to cure this shortcoming.

Treasury also needs to identify the particular policy decisions to which the various documents correspond. Treasury cites *Tigue*, 312 F.3d at 80, for the proposition that it need not identify a specific decision made in reliance on the document, only a specific policy issue. (*See* Mem. of Law in Further Supp. of Treasury's Mot. for Summ. J. and in Opp'n to Pl.'s Cross–Mot. for Summ. J. (Docket No. 48) at 14). However, in *Tigue* the Second Circuit also stated that, "while the agency need not show *ex post* that a decision was made, it must be able to demonstrate that, *ex ante*, the document for which ... privilege is claimed related to a specific decision facing the agency." *Tigue*, 312 F.3d at 80 (discussing *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1094 (9th Cir. 1997)). In this case, it is insufficient to state that the documents all relate to the AIG and Citi transactions. For documents that relate to decisions other than the specific terms of these transactions (such as documents created after the terms of the transactions were finalized), Treasury needs to identify the particular decisions to which the documents correspond. In the

alternative, if a decision was not made based upon the document, Treasury must identify the specific issue facing the agency that the document addressed and note that a decision was not made.

■■■ The other element that requires amplification is whether the documents are "deliberative." To be deliberative, a document must actually be "related to the process by which policies are formulated." *Grand Cent. P'ship*, 166 F.3d at 482. Among the factors that courts have considered in this regard are whether the document formed an essential link in a specific consultative process, whether it reflects the personal opinion of the writer rather than the policy of the agency, and whether, if released, it would inaccurately reflect or prematurely disclose the views of the agency. *Id.* Thus, Treasury must actually identify and explain the role that a given document has played in the decisionmaking process. *See, e.g., Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C.Cir.1980) ("agency has the burden of establishing what deliberative process is involved, and the role played by the documents in issue in the course of that process"). While this may be obvious for some documents, for others it is not. For example, the role played by an "[e]mail string between [parties] commenting on draft executive compensation provisions proposed by Citi for [the] contemplated Citi transaction" (Index Nos. W3070–W3073)[2] seems self-explanatory. On the other hand, it is not clear from Treasury's *Vaughn* index what role, if any, an "Implementation timeline" (Index Nos. 2664–

2666) or "work streams related to proposed AIG transaction" (Index Nos. 8894–8896) played in an eventual decision.[3]

■■■ Treasury also appears to take it as an article of faith that a document labeled "Draft" is automatically protected by the deliberative process privilege. That is not so. *See New York Times Co. v. U.S. Dep't of Def.*, 499 F.Supp.2d 501, 515 (S.D.N.Y.2007) ("[T]he mere fact that a document is a draft ... is not a sufficient reason to automatically exempt it from disclosure.") (quoting *Lee v. Fed. Deposit Ins. Corp.*, 923 F.Supp. 451, 458 (S.D.N.Y. 1996)); *see also Coastal States Gas Corp.*, 617 F.2d at 869 ("[The] contention that these documents are not 'final opinions,' absolutely binding on the auditors, misses the point."). While drafts often may be protected by the deliberative process privilege and therefore fall within Exemption 5, Treasury still is obligated to provide the information discussed above. *See New York Times Co.*, 499 F.Supp.2d at 515 ("Defendants' descriptions do not include specific information about the draft documents such as their function and significance in the agency's decisionmaking process.") (citation and internal quotation marks omitted). Indeed, it would be helpful for Treasury to identify whether each draft document ever was finalized, and, if so, whether the final version has been provided to Fox or made available publicly. *See id.*, 06 Civ. 1553(RMB) (S.D.N.Y. Jul. 20, 2007) (directing defendant to submit to the court the final version of all documents identified as drafts, state whether the final version was provided to plaintiff, and de-

---

2. The *Vaughn* index to which these and other parenthetical numbers refer is Exhibit A to the Declaration of Joseph J. Samarias, dated June 22, 2009. (*See* Doc. No. 23). Index numbers preceded by a "W" indicate that the documents were withheld in full.

3. I cite these documents merely as examples of the deficiencies in Treasury's index with respect to the role that the documents played in deliberative process. These examples also illustrate the importance of identifying the particular decision to which the documents relate.

scribe the differences between the draft and final versions). This is important because a document that never was finalized might nevertheless have operated to dictate policy within the agency. *See Coastal States Gas Corp.*, 617 F.2d at 867 ("A strong theme of our opinions has been that an agency will not be permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'").

*Exemption 4*

 Treasury also has withheld documents pursuant to 5 U.S.C. § 552(b)(4) ("Exemption 4"). For Exemption 4 to apply, the information "must be a trade secret or commercial or financial in character," must be "obtained from a person," and must be "privileged or confidential." *Inner City Press/Cmty. on the Move v. Bd. of Governors of the Fed. Reserve Sys.*, 463 F.3d 239, 244 (2d Cir.2006) (internal quotation marks omitted). To determine whether information is "confidential" for purposes of Exemption 4, the Second Circuit has adopted a two-part test. Under the test, "information is confidential for the purposes of Exemption 4 if its disclosure would have the effect either: '(1) of impairing the government's ability to obtain information—necessary information—in the future, or (2) of causing substantial harm to the competitive position of the person from whom the information was obtained.'" *Id.* (quoting *Cont'l Stock Transfer & Trust Co. v. SEC*, 566 F.2d 373, 375 (2d Cir.1977) (per curiam)). Although it is not necessary to show that disclosure "certainly" would cause substantial competitive harm, Treasury must show that disclosure is "likely" to do so. *McDonnell Douglas v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C.Cir. 2004).

 The parties have several disagreements concerning the showings required under Exemption 4, but the Court requires additional information only as to the alleged substantial harm that disclosure would cause to the competitive positions of AIG, Citi, BONY, and NYFRB. For documents related to compensation, the argument advanced by Treasury is clear and there is no need for additional descriptions. Similarly, where Treasury has provided sufficient justifications through the declarations submitted on its behalf, such as with respect to a Citi presentation (Index Nos. W3176–W3191) and the BONY custodianship proposal (Index Nos. W2886–2887), no additional information is necessary for the Court to rule.

In other instances where Treasury relies on Exemption 4, more detailed descriptions of the documents withheld and the specific information contained in those documents that allegedly would cause competitive harm are necessary. For example, Treasury argues generally that it properly withheld certain information regarding AIG under Exemption 4 because it would be harder for AIG to negotiate good deals for the sale of its assets if potential purchasers were to receive this information (and therefore harder for AIG to pay back the American taxpayers). (*See* Treasury Mem. at 44–46). In that regard, AIG claims that the "more potential purchasers know about the negotiating points and disputes and terms of the agreements between AIG and the federal government, the more they will know what terms were important to AIG, and ... will be able to take advantage of that information to find the weak points of AIG in their negotiations with the Company. Such information includes, among other things, times and conditions of repayment, priority of debt, and other terms imposed on AIG." (Decl. of Nicholas Kourides, dated June 19, 2009 ¶ 9). This boilerplate explanation is AIG's sole justification for withholding

more than forty documents that allegedly "contain sensitive information about the negotiations between AIG and the government that could be used to weaken its position in negotiating with potential purchase[r]s of AIG assets." (*Id.* ¶ 10). Treasury cannot meet its burden simply by stating that all of these withheld documents contain some type of sensitive information, the disclosure of which would prevent AIG from maximizing the value of its asset sales.

Accordingly, in its next submission, Treasury should specify the type of sensitive information allegedly contained in each document, and how that particular information could be used to the competitive disadvantage of the person from whom the information was obtained. If necessary, Treasury should submit supplemental declarations or affidavits that correspond to the additional descriptions of the individual documents.

*Conclusion*

By December 11, 2009, Treasury shall make its submission concerning its failure to search for documents containing the "BONY" acronym. By December 31, 2009, Treasury shall provide the additional information required by this Order, together with an updated list in Excel or similar format identifying the withheld documents still being contested and the exemption or exemptions claimed for each such document. Thereafter, by January 10, 2010, Fox may make any responsive submission it believes is necessary. As Fox has requested, the Court will then hear oral argument concerning the cross-motions for summary judgment on January 22, 2010, at 2:00 p.m., in Courtroom 20A.

SO ORDERED.