The CITY OF VIRGINIA BEACH and Thomas M. Leahy, III, Plaintiffs,

v.

The UNITED STATES DEPARTMENT OF COMMERCE, Defendant.

Civ. A. No. 91–218–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

Nov. 6, 1992.

**1324**

Michael Scott Hart, George A. Somerville, Susan Warriner Custer, John Franklin Kay, Jr., Alan Dale Albert, Eric W. Schwartz, Mays & Valentine, Richmond, Va., Leslie Louis Lilley, William Matthew MacAli, Office of City Atty., Municipal Center, Virginia Beach, Va., for Virginia Beach and Thomas M. Leahy, III.

Michael Anson Rhine, U.S. Attys. Office, World Trade Center, Norfolk, Va., Elizabeth A. Pugh, Victoria J. Rosenthal, Dept. of Justice, Civ. Div., Judith Means, Office of Gen. Counsel, U.S. Dept. of Commerce, Washington, D.C., Jane Hannuksela, Office of Gen. Counsel, National Oceanic and Atmospheric Admin., Silver Springs, Md., for U.S. Dept. of Commerce.

## MEMORANDUM OPINION

PAYNE, District Judge.

The City of Virginia Beach and Thomas M. Leahy, III, (collectively "the City") have filed an action under the Freedom of Information Act ("FOIA" or the "Act") to compel the production of certain documents in the possession of the National Marine Fisheries Service ("NMFS"), a branch of the United States Department of Commerce (the "Department of Commerce"). The action is properly before the court pursuant to 28 U.S.C. § 636(b)(1)(C), which entitles the parties to a *de novo* review of the Magistrate Judge's Superseding Report and Recommendation of June 19, 1992 (the "Report") to which the City and NMFS have filed timely Notices of Objection.

## STATEMENT OF THE FACTS

On April 9, 1991, the City instituted this action under the FOIA, 5 U.S.C. § 552,[1] to

---

1. The Act provides, in pertinent part:

(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

(B) those statements of policy and interpretations which have been adopted by the agen-

obtain certain documents withheld by NMFS when it responded to the City's FOIA request for documents related to the City's proposed Lake Gaston water supply project (the "Project"). The aim of the Project is to supplement the water needs of Southeastern Virginia by withdrawing 60 million gallons of water per day from Lake Gaston which is located on the Roanoke River.[2] The City acquired a permit for the Project from the United States Army Corps of Engineers ("the Corps") in February 1984, and the City and the Virginia Electric and Power Company are currently seeking approval of the Project from the Federal Energy Regulatory Commission ("FERC"). NMFS was not a party to the proceedings by which the Corps issued the City's permit, although it did participate extensively by providing scientific comment on what effect, if any, the project might be expected to have on fish habitats and fisheries in the areas affected by the Project. On June 20, 1991, NMFS intervened as a party to the FERC proceeding.

In 1983, during the permitting proceedings before the Corps, NMFS had specifically concurred with the Corps' finding of no significant environmental impact (FONSI). In 1983, NMFS also had concurred with the Corps' decision not to prepare a costly and time-consuming environmental impact statement (EIS) before issuing the City's permit.

On July 7, 1987, the United States District Court for the Eastern District of North Carolina remanded the City's permit to the Corps for further studies. *See North Carolina v. Hudson*, 665 F.Supp. 428 (E.D.N.C.1987). Shortly after the remand, and for reasons neither explained nor readily apparent at the time, NMFS reassigned primary responsibility for review of the Project from its Northeast Regional Office in Oxford, Maryland to its Southeast Regional Office, and principally to NMFS personnel located in Beaufort, North Carolina whom the City alleges

"have a close working relationship with agencies and employees of the State of North Carolina, [the City's] chief adversary." NMFS continued to provide scientific comment on what effect, if any, the Project might be expected to have on fish habitats and fish in the areas affected by the Project. According to the City, after the reassignment of responsibility from the Northeast Regional Office to the Southeast Regional Office, "NMFS's attitude toward Virginia Beach and its representatives changed from open and cooperative to secretive and hostile ...," and NMFS "reversed its position on the need for an [Environmental Impact Statement] and demanded expensive and time consuming studies of 'potential impacts' which already [had] been addressed in lengthy and expensive studies and shown to present no potential for adverse environmental impacts." (Plaintiff's Objections to Report at pp. 3–4) The City also alleges that NMFS's actions "demonstrated that some elements within NMFS were unable or unwilling to evaluate its Project fairly or objectively." (*Id.* at 4)

On July 30, 1990, the City delivered to NMFS a letter which expressed the City's concerns about NMFS's conduct respecting the Project and posed the following questions to NMFS:

1. Do the Services have any *quantifiable* data, evidence, or analyses which would demonstrate that the City's computer model and/or mitigation plan will not work as stated in its December 7, 1987, transmittal?

2. Do the Services have any *quantifiable* data, evidence, or analyses to indicate that the City's mitigation plan, which is now a permit requirement, will not mitigate the project's small impact to the Flow Committee's experimental regime in the same manner as it would the 1971 MOU regime?

---

cy and are not published in the Federal Register; ....

**2.** For a detailed discussion of the Project and the litigation related to it, *see generally North Carolina v. Hudson*, 731 F.Supp. 1261 (E.D.N.C.

1990), *aff'd sub nom. Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1164, 117 L.Ed.2d 411 (1992).

3. In *quantitative* terms, how could the Services find in 1983 that the project *without* mitigation would have "minimal" impacts and in 1988 that the same project *with* mitigation would have significant impacts?

4. Would each Service please state the circumstances, logic, and rationale for shifting the review of the project from the Northeast region to the Southeast region?

5. Who should Virginia Beach contact at each respective Service if it has future requests for information.

(July 30, 1990 letter from City to NMFS (emphasis in original)) The City also raised numerous allegations of what it perceived to be misconduct or legally inappropriate action on the part of some NMFS employees involved the decisions and recommendations respecting the Project previously made by NMFS.[3]

NMFS replied by letter dated September 11, 1990, stating that it was in the process of formulating a response to the City's questions. At the same time, Dr. William W. Fox, Jr., the head of NMFS, informed the City that NMFS was conducting an independent investigation of the City's allegations respecting actions previously taken by NMFS employees in respect of the Project.

Dr. Fox responded to the City's letter by letter dated November 15, 1990. He explained that NMFS had transferred responsibility for review of the Project from its Northeast Regional Office to its Southeast Regional Office because "service personnel located in the area where the impact occurs; i.e. in North Carolina, the Wilmington District, and the Southeast Region, are more familiar with the affected resource and therefore more able to assess potential impacts." The letter did not, however, respond substantively to the City's allegations of legally inappropriate conduct by NMFS employees. Nor did the letter respond substantively to the City's questions respecting that mitigation proposal or provide reasons for the alleged change of position by NMFS between 1983 and 1988 respecting the need for an Environmental Impact Statement.

On December 12, 1990, the City, confronted with what it considered a legally inadequate response to its inquiries, filed a request pursuant to the FOIA calling upon NMFS to produce copies of certain records related to the Project. On December 28, 1990, NMFS sent the City an interim response to the request accompanied by three documents. On January 18, 1991, NMFS supplemented its response by releasing 444 additional pages of documents, and withholding 71 of the requested records on the grounds that they were exempt under the provisions of 5 U.S.C. § 552(b)(5) (hereafter "Exemption 5"). On February 8, 1991, the City appealed the position of NMFS on those 71 documents to the Department of Commerce which, on March 28, 1991, issued its final decision denying the City's appeal. Having exhausted its administrative appeals, the City filed this action to obtain access to the 71 documents withheld by NMFS under Exemption 5.

NMFS moved for summary judgment on the ground that there was no genuine issue of material fact as to whether the withheld documents were entitled to protection from disclosure under Exemption 5. A hearing was held before the Magistrate Judge, and the documents in dispute were submitted under seal for *in camera* review. The Magistrate Judge recommended that summary judgment be granted in part and denied in part. (Report at 3) It is from these recommendations that both parties now appeal.

For the reasons explained below, the court adopts the Magistrate Judge's recommendations as they relate to the documents

---

**3.** The City alleged that 1) NMFS had cited nonexistent "additional information [and] recently acquired data" to support its alleged reversal on the need for an Environmental Impact Statement; 2) NMFS had stated falsely that it had had no opportunity to comment on the City's mitigation proposal; 3) NMFS's position in regard to the Project was based on helping the State of North Carolina and a North Carolina congressman stymie the project; 4) employees within NMFS were using their positions within the Agency to advance their interests outside NMFS; and 5) NMFS was not objective in its assessments of the Project.

protected by the attorney work-product privilege [4]. However, the court finds that the documents which NMFS seeks to protect under the "deliberative process" privilege are not covered by that privilege and directs NMFS to produce them.[5]

## DISCUSSION

The Act requires full disclosure of documents to which it applies unless the information requested is *clearly exempt* under the Act. *Deering Milliken, Inc. v. Irving,* 548 F.2d 1131 (4th Cir.1977) (emphasis added). The purpose of the Act is "to open agency action to the light of public scrutiny," *Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 772, 109 S.Ct. 1468, 1481, 103 L.Ed.2d 774 (1989), because "the public is entitled to know what its government is doing and why." *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 868 (D.C.Cir. 1980). In keeping with this policy, the Act imposes on the claiming agency the burden to establish that a statutory exemption precludes disclosure. *Ethyl Corp. v. EPA,* 478 F.2d 47, 49 (4th Cir.1973). *See also Dep't of Justice v. Reporters Comm.,* 489 U.S. at 755, 109 S.Ct. at 1472 (FOIA expressly places the burden on the agency to sustain its action and directs the district courts to determine the matter *de novo.*)

The Act contains nine enumerated exemptions which allow an agency to withhold documents from disclosure to public scrutiny.[6] NMFS bases its refusal to disclose the 71 documents here at issue on Exemption 5, which protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than any agency in litigation with the agency." 28 U.S.C. § 552(b)(5). The purpose of Exemption 5 is simply to accord an agency the privileges normally available to the government in the context of discovery in civil actions, *see* H.R.Rep. No. 1497, 89th Cong.2d Sess. 10 (1966); S.Rep. No. 813, 89th Cong., 1st Sess. 2, 9 (1965), and this exemption has been interpreted as protecting from disclosure documents which fall within the traditionally recognized work-product and attorney-client privileges, as well as the so-called "executive" or "deliberative process" privilege which is of more recent origin. *Pies v. Internal Revenue Service,* 668 F.2d 1350 (D.C.Cir.1981). Here NMFS has asserted the work-product privilege as the ground for not disclosing some documents and it has claimed the deliberative process privilege as the basis for not disclosing others. Each claim is considered in turn.

### I. *The Work–Product Privilege*

■ The work-product privilege provides a lawyer with a "zone of privacy" within which to think, plan, weigh facts and evidence, candidly evaluate the client's case, and prepare (or consider and reject) legal theories. *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d at 864. Uniformly, the privilege has been held to be

4. NMFS asserts the work-product privilege for documents 2, 3, 18 and 71. During the course of *in camera* review of the documents, the court has determined that documents 4 and 6 are the same as document 3. Therefore, the Court will consider the work-product privilege to have been asserted for documents 2, 3, 4, 6, 18 and 71.

5. NMFS asserts that deliberative process privilege for documents 1, 5, 7, 8, 10, 11, 12, 13, 14, 17, 19, 21, 23, 24, 25, 28, 29, 30, 32, 33, 35, 36, 37, 39, 41, 42, 43, 44, 45, 46, 47, 49, 50, 51, 52, 53, 54, 55, 59, 60, 61, 64, 65, 66, 67, 68, 69, 70, 73, 74, 75, and 76.

The Court finds that no claim of exemption has been articulated for the following documents: 9, 27, 56, 57, 58, 62, 63, and 72. *In camera* review has revealed that: 1) document 9 is the same as document 8; 2) document 27 is the same as document 25; 3) document 56 is the same as document 51; 4) document 58 is a draft of document 41; 5) document 62 is a draft of document 44; and 6) document 63 is a draft of document 50. Because documents 9, 27, 56, 58, 62, and 63 are either the same, or drafts of the same, documents for which the deliberative process privilege has been asserted, the court will consider the privilege to have been asserted for all of those documents. Documents 57 and 72 will be discussed in § III, *infra.*

Finally, the following documents have already been released to the City: 15, 16, 20, 22, 26, 31, 34, 38, 40, and 48.

6. This action does not involve documents of third parties delivered to an agency pursuant to law or compulsory process and hence nothing in this opinion is intended to address disclosure of documents delivered, or reports made, to an agency by third-parties.

limited to documents prepared during, or in contemplation of, litigation. *Id.* at 864–65. However, the mere possibility of litigation is not sufficient to activate the privilege. "At the very least some articulable claim, likely to lead to litigation, must have arisen." *Id.* at 865. *See also Sandberg v. Virginia Bankshares, Inc.*, 979 F.2d 332, 354 (4th Cir.1992); *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir.1992).

Certain documents withheld by NMFS fall squarely within the work-product privilege, and therefore were properly withheld by NMFS under Exemption 5. Documents 2, 3, 4, 6 and 18 reflect the mental impressions of NMFS attorneys with respect to the opening and reply briefs filed by the Corps as the defendant in the appeal in *North Carolina v. Hudson.* As the Magistrate Judge correctly observed, "these documents reflect comments made by the agency to the Department of Justice, which was representing the Corps, pertaining to certain characterizations of [NMFS's] positions that the Department of Justice had made in its briefs on appeal." (Report at 22–23)[7] Accordingly, the court finds that NMFS properly withheld from disclosure Documents 2, 3, 4, 6 or 18 to the City.[8]

## II. *The Deliberative Process Privilege*

NMFS withheld most of the documents sought by the City on the ground that they fall within the deliberative process privilege. As explained by the Supreme Court of the United States in *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975), "the cases uniformly rest the [deliberative process] privilege on the policy of protecting the 'decision making process of government agencies,' ... and focus on documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Id.* at 150, 95 S.Ct. at 1516 (citations omitted). *See also Wolfe v. Dep't of Health & Human Services*, 839 F.2d 768, 773 (D.C.Cir.1988) (en banc); *Mead Data Central, Inc. v. U.S. Department of Air Force*, 566 F.2d 242, 256 (D.C.Cir.1977).

Three important policies underlie the deliberative process privilege accorded by Exemption 5:

> First, it protects creative debate and candid consideration of alternatives within an agency, and, thereby, improves the quality of agency policy decisions. Second, it protects the public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon. And third, it protects the integrity of the decision-making process itself by confirming that 'officials should be judged by what they decided[,] not for matters they considered before making up their minds.'

*Jordan v. Dep't of Justice*, 591 F.2d 753, 772–73 (D.C.Cir.1978) (footnotes omitted). *See also Wolfe v. Dep't of Health & Human Services*, 839 F.2d at 773 ("Congress adopted Exemption 5 because it recognized that the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fish-

---

**7.** The City argues that NMFS should be unable to assert the work-product privilege for these documents because NMFS was not a named party to the appeal of *North Carolina v. Hudson.* The court agrees with the conclusions and reasoning of the Magistrate Judge finding that the fact that NMFS was not a party to that litigation does not disqualify it from invoking the protection of the work-product privilege under the circumstances of this case. (Report at 23)

Moreover, the mere fact that one agency discloses documents to another agency usually is not enough to constitute a waiver under Exemption 5. *See, e.g., Chilivis v. SEC,* 673 F.2d 1205, 1211–12 (11th Cir.1982) (the fact that the SEC disclosed documents to other federal agencies did not waive the SEC's right to invoke Exemption 5); *Shermco Industries v. Secretary of the Air Force,* 613 F.2d 1314, 1320 (5th Cir.1980) (mere fact that one federal agency released intra-agency communications to another federal agency cannot by itself imply the waiver of Exemption 5).

**8.** The court finds that Document 71, which addresses NMFS's position in the pending FERC proceedings, does not fit within the scope of the work-product privilege asserted for it by NMFS. Inasmuch as it relates to the ongoing administrative proceedings before the FERC, however, it does fall within the scope of the deliberative process exemption and was properly withheld. *See* pp. 1328–1334, *infra.*

bowl"). With these policies in mind, "the lower courts have uniformly drawn a distinction between pre-decisional communications, which are privileged, ... and communications made after the decision and designed to explain it, which are not." *NLRB v. Sears*, 421 U.S. at 151–52, 95 S.Ct. at 1517.

Against this background, and mindful of the policy favoring disclosure which is the legislative underpinning of the Act, the court now examines NMFS's claim to exemption under the deliberative process privilege. NMFS takes the position that its response to the City's letter of July 30, 1990, was an agency "decision," and that therefore all memoranda, documents, drafts and communications related to its response are exempt from disclosure because they are "deliberative" and "pre-decisional" within the meaning of Exemption 5. NMFS bears the burden of demonstrating that the documents it seeks to invest with the protection of the deliberative process privilege are both "pre-decisional" and "deliberative." *Wolfe*, 839 F.2d at 774.

A document is pre-decisional if it was generated *before* the adoption of an agency policy, and it is deliberative if it reflects the "give-and-take" of the consultative process by which the agency policy or decision is made. *Coastal States Gas Corp.*, 617 F.2d at 866 (emphasis in original). *See also Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C.Cir.1975) (to be protected the document must be a direct part of the deliberative process in that it makes recommendations or expresses opinions on an agency policy or decision). Also, it is essential to remember that the deliberative process privilege does not exempt "purely factual material appearing in ... documents in a form that is severable without compromising the private remainder of the docu-

ments." *Playboy Enterprises, Inc. v. Dep't of Justice*, 677 F.2d 931, 935 (D.C.Cir.1982) (quoting *EPA v. Mink*, 410 U.S. 73, 91, 93 S.Ct. 827, 838, 35 L.Ed.2d 119 (1973)).[9] *See also Paisley v. CIA*, 712 F.2d 686, 698 (D.C.Cir.1983) ("factual material that does not reveal the deliberative process is not protected by this exemption"); *Charlotte–Mecklenburg Hosp. Auth. v. Perry*, 571 F.2d 195, 198 n. 5 (4th Cir.1978) (Exemption 5 does not protect purely factual or investigatory reports).

The decisions which have considered Exemption 5 teach that the application of the deliberative process privilege is a case specific and fact intensive process "because the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d at 867. Hence, in order to determine whether an agency's claim of the privilege is valid, it is necessary to ascertain the kind of action in which the agency was engaged when it generated the allegedly privileged documents, and to analyze the role of the documents in that process. *Id.* at 858.

With this guidance in mind, the court has reviewed the 52 documents withheld by NMFS under its claim of the deliberative process privilege. These documents can be divided into three broad categories:

A. Documents and letters, in draft and final form, addressing the questions raised by the City's letter dated July 30, 1990 ("Category A");[10]

B. The so-called "Collins Report" and related documents addressing the allegations of NMFS misconduct set forth in the City's letter dated July 30, 1990 ("Category B");[11] and

---

**9.** In *Mink*, the Supreme Court of the United States held that factual segments of documents are exempt from disclosure if the manner of selecting or presenting those facts would reveal the agency's deliberative thinking, or if the facts are so "inextricably intertwined" with the policy-making process that it would be impossible to disclose the factual material "without compromising the private remainder of the document." 410 U.S. at 91, 93 S.Ct. at 838 (1973).

**10.** Documents 8, 12, 13, 14, 17, 19, 21, 23, 24, 25, 28, 29, 33, 35, 36, 37, 39, 42, 43, 44, 45, 46, 49, 50, 52, 53, 59, 60, 61, 64, 65, 66, 67, 68, 69, 70, 73, and 74.

**11.** Documents 10, 11, 30, 32, 41, 54, and 55.

C. Miscellaneous documents ("Category C").[12]

The documents in each category are addressed below.

A. Documents Generated In Response To The City's Five Numbered Questions

■ In its letter of July 30, 1990, the City raised five specific questions about actions previously taken by NMFS and about what the City perceived to be changes in NMFS's previously articulated position with respect to fundamental aspects the Project. In effect, the City asked NMFS to set forth publicly and in detail the bases on which those actions had been taken and the reasons why NMFS, according to the City, had changed it position on those aspects of the Project. The City's questions made it necessary for NMFS to divulge the basis of positions which, according to the City, NMFS previously had adopted and then revised without explanation.

NMFS contends that the process of formulating a response to the City's questions and allegations of misconduct was a "policy-making process." This characterization is erroneous in fact because the documents in Category A were not generated in the process of making an NMFS policy or decision. Instead, they were created to *explain*, after the fact, NMFS decisions which already had been made. Documents of this kind are not entitled to the protection afforded pre-decisional documents. For example, in *NLRB v. Sears, Roebuck & Co.*, the Supreme Court explained that "the public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted." 421 U.S. at 152, 95 S.Ct. at 1517. Accordingly, documents which explain the basis for a previously adopted agency policy or an agency decision previously made are beyond the limited protection from disclosure afforded

by the deliberative process privilege. After weighing the public's interest in disclosure against the risk of harm to the agency decision-making process, the Supreme Court concluded that disclosure "is supported not only by the lesser injury to the decision-making process flowing from disclosure of post-decisional communications, but also, in the case of those communications which explain the decision, by the increased public policy interest in knowing the basis for agency policy already adopted." *Id.* at 152, 95 S.Ct. at 1517.

The content of the documents in Category A and the context in which they were generated leads the court to the conclusion that these documents were "made after the decision and designed to explain it." *NLRB v. Sears*, 421 U.S. at 151–152, 95 S.Ct. at 1517. As such, they fall outside the ambit of Exemption 5.[13]

Nor has NMFS established that the documents in Category A are deliberative in nature. In fact, on their face, these documents appear principally to contain factual information pertinent to the questions posed to NMFS in the City's letter. These documents do not reflect the give and take one associates with the internal deliberation antecedent to the establishment of agency policy or the making of an agency decision. Hence, the documents in Category A cannot be characterized as "deliberative" within the meaning of the deliberative process privilege. But, even if these documents could be accorded that appellation, they would not fall within the scope of the privilege because, for the reasons set forth above, they are not pre-decisional. In fact, the documents in Category A contain very little by way of opinions or recommendations about *future* agency actions or policy. To the extent that the documents contain such information, it relates principally, if not exclusively to, the FERC proceedings and that information easily can be redacted

---

**12.** Documents 1, 5, 7, 47, 75, and 76.

**13.** It is true that the existence of the deliberative privilege does not turn on the "ability of the agency to identify a specific decision in connection with which a memorandum is prepared."

*Sears* at 151, n. 18, 95 S.Ct. at 1517, n. 18. But where, as here, it is readily apparent that the documents explain a policy already formulated, *NLRB v. Sears* teaches that Exemption 5 is inapplicable.

and properly withheld.[14] As Justice White made clear in *EPA v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), the Act dictates a common-sense approach to disclosure of documents that contain both facts and opinions:

> Congress sensibly discarded a wooden exemption that could have meant disclosure of manifestly private and confidential policy recommendations simply because the document containing them also happened to contain factual data. That decision should not be taken, however, to embrace an equally wooden exemption permitting the withholding of factual material otherwise available on discovery merely because it was placed in a memorandum with matters of law, policy, or opinion.... Exemption 5 contemplates that the public's access to internal memoranda will be governed by the same flexible, common-sense approach that has long governed private parties' discovery of such documents involved in litigation with Government agencies.... [T]hat approach extended and continues to extend to the discovery of purely factual material appearing in those documents in a form that is severable without compromising the private remainder of the documents.

410 U.S. at 91, 93 S.Ct. at 838. *Accord Ethyl Corp. v. EPA*, 478 F.2d at 49–50 ("simply because a document contains both purely factual material and 'materials reflecting deliberative or policy-making processes' does not render the document automatically exempt from discovery").

Some of the documents in Category A are drafts of the NMFS response to the City's five questions. Others are responses suggested by NMFS employees and topical papers addressed to some, but not all, of the City's queries. Many, indeed most of the drafts, contain purportedly factual material which should be disclosed simply because it is entitled to no exempt treatment. In any event, the fact that a document is a draft does not alone entitle it to classification as part of the deliberative process.

In that regard, it is appropriate to remember that the purpose of Exemption 5 is simply to afford the government the protections it would have in civil litigation. Of course, there is no privilege which protects against disclosure of drafts of otherwise non-exempt documents. Indeed, it is usual in civil litigation to require disclosure of the drafts of documents which themselves are not exempt from disclosure. Accordingly, the drafts also fail to qualify for protection under Exemption 5.

### B. The "Collins Report" and Related Documents

■ NMFS characterizes the "Collins Report"[15] as a "preliminary investigation of the City's July 30, 1990 allegations concerning the alleged misconduct of a scientist employed by NMFS." According to NMFS, this purported preliminary status exempts the Collins Report from disclosure.[16] (Defendant's Response To Plaintiffs' Objections To Magistrate Judge's Superseding Report and Recommendation, at p. 1) The Collins Report, once distributed within NMFS, created a great deal of con-

---

**14.** Of the 52 documents withheld under the deliberative process privilege, the court finds that only document 65 contains text that can properly be redacted and withheld. A portion of the first paragraph of document 65 relates to the pending FERC proceedings, and is therefore pre-decisional and deliberative. The entire last paragraph is also deliberative and pre-decisional, as it regards NMFS's position on future Superfund issues. The court has placed in the file of this case a copy of document 65 with these portions redacted, which should be turned over to the City.

**15.** The "Collins Report" itself is document 11. Document 10 is a summary of the Collins Re-

port, prepared by Kevin Collins on August 24, 1990.

**16.** The Magistrate Judge found that the Collins Report and related documents were pre-decisional, and that any factual material contained in the documents "is so inextricably intertwined with the opinions, recommendations and suggestions of the NMFS employees who created these documents that it would be impossible to segregate this factual evidence from the deliberations and assessments of the writer." (Report at p. 17) The court views the Collins' Report and related documents differently and hence declines to adopt that part of the Report.

troversy and prompted numerous responses and comments which hereafter are referred to as "related report documents." [17]

The Collins Report and the related report documents are neither deliberative nor predecisional within the meaning of Exemption 5. These documents, like those in Category A, are an after the fact explanation of actions previously taken by agency employees. And, they are not related to the formulation of agency policy or decisions. For these reasons, the Collins Report and the related report documents do not fall within the scope of the deliberative process privilege.

■ Moreover, it is well-settled that Exemption 5 does not protect purely factual or investigative reports. *Charlotte–Mecklenburg Hosp. Auth. v. Perry*, 571 F.2d 195, 198 n. 5 (4th Cir.1978). It also is clear that factual reports which do not reveal the deliberative process are also not protected. *Paisley v. CIA*, 712 F.2d 686, 698 (D.C.Cir. 1983) (citing *EPA v. Mink*, 410 U.S. 73, 89–91, 93 S.Ct. 827, 837–38, 35 L.Ed.2d 119 (1973)). The Collins Report and related report documents are factual and investigative in nature. Further, they do not reveal any deliberative process. For these additional reasons, they do not fall within the scope of the deliberative process privilege.

The City's July 30, 1990, letter raised serious allegations that: 1) NMFS changed its position on the need for an Environmental Impact Statement citing "new evidence" that in reality did not exist; 2) NMFS falsely represented that it had not seen a detailed mitigation plan submitted by the City; 3) NMFS's position on the Project was an effort to assist the efforts of the State of North Carolina and a North Carolina Congressman to stymie the project; and 4) an NMFS scientist used his position within NMFS to help derail the Project to advance his own interests, among them the agenda of the North Carolina Wildlife Federation (of which he was president during the relevant time period). Kevin Collins, an NMFS attorney,[18] was assigned to investigate these allegations, and his report gave answers to the allegations which, if correct, place the NMFS and its personnel in a less than flattering light.[19] Although several NMFS employees disagreed with the Collins Report and others criticized it as erroneous and sought to belittle its author, the Collins Report presents the results of an official investigation conducted by the NMFS into allegations of misconduct and mistakes by the agency in connection with previously taken administrative action.

That NMFS did not recite the Collins Report in its formal reply to the City does not, as NMFS suggests, render the document preliminary or non-disclosable. Here the head of NMFS chartered an investigation into the City's allegations of employee misconduct, appointed Collins to conduct that investigation and even told the City that the investigation was underway. The agency's formal response to the City did not address the City's allegations of misconduct, notwithstanding that the report of the investigation had been completed. This clearly reflects that someone within the agency decided not to rely on the Collins

17. Document 30 is a letter from Dr. Charles Manooch, III, the NMFS scientist who was the focus of many of the City's allegations of impropriety, to Dr. John Merriner, Chief of the Division of Fisheries of the Beaufort Lab, responding to the Collins Report. Document 32 consists of 2 memoranda from Jane Hannuksela regarding distribution of the Collins Report. Document 41 is a cover memorandum from Andrew Kemmerer to William Fox which express concerns the Southeast Region had about the Collins Report. Documents 54 and 55 are detailed memoranda from Kemmerer to Fox outlining these concerns.

18. In any event, NMFS does not assert a work-product or attorney-client privilege as the basis

for withholding the Collins Report and the related report documents.

19. The fact that the Collins Report, and indeed many of the disputed documents, were prepared by an attorney does not, without more, transform them into attorney work-product. As pointed out by the D.C. Circuit in *Coastal States Gas Corp.*, "if an agency were entitled to withhold any document prepared by any person in the Government with a law degree simply because litigation might someday occur, the policies of the FOIA would be largely defeated." 617 F.2d at 865. In any event, NMFS does not assert any claim of privilege based on Collins' status as a lawyer.

Report but it does not make the report preliminary. The text of the report and the context of its preparation clearly reflects otherwise. The court finds that the Collins Report and its summary are not preliminary in nature. Hence, even if the determination of its status turned on that issue (which it does not), the Collins Report and the summary would not exempt that ground.

The decision of the United States Court of Appeals for the D.C. Circuit in *Playboy Enterprises, Inc. v. Dep't of Justice*, 677 F.2d 931 (D.C.Cir.1982) is instructive on how documents such as the Collins Report, the summary of it prepared by Collins, and the related report documents should be treated under Exemption 5. In *Playboy,* the Attorney General of the United States created a "task force" within the Department of Justice to investigate allegations regarding the possible misconduct of an FBI informant, and to determine if FBI personnel had acted improperly. *Id.* at 933–934. The task force prepared and submitted a 302 page report based on a review of "approximately 800 volumes of FBI records ... and sixty-four interviews of past and present FBI agents, Justice Department attorneys, state and local law enforcement officials, FBI informants, and Ku Klux Klan members." *Id.* at 933. As the City points out, the report in *Playboy Enterprises* bears substantial similarity to the Collins Report and the summary. (Plaintiffs' Objections To Magistrate Judge's Superseding Report and Recommendation, at p. 16) All were prepared in order to address allegations of employee misconduct respecting previously taken agency action, and all were compiled by conducting extensive interviews and document reviews.

In *Playboy Enterprises* the district court found, and the court of appeals agreed, that "the only mission of the task force was 'to investigate the facts surrounding certain events.'" 677 F.2d at 935 (citation omitted). Like the plaintiff in *Playboy Enterprises*, the City "merely seeks the facts that were uncovered in this investigation of alleged government misconduct." *Id.* There, as here, the government resisted disclosure by arguing that "the entire [report] reflects the 'choice, weighing and analysis of facts' by the [agency investigator], and is therefore protected as a part of the deliberative process." *Id.* Just as that argument failed in *Playboy Enterprises*, it must fail here:

> Anyone making a report must of necessity select the facts to be mentioned in it; but a report does not become part of the deliberative process merely because it contains only those facts which the person making the report thinks material. If this were not so, every factual report would be protected as part of the deliberative process.

*Id. Accord Moore–McCormack Lines, Inc. v. I.T.O. Corp. of Baltimore*, 508 F.2d 945, 948 (4th Cir.1974) (both the facts revealed by an investigation and the inferences drawn from those facts may influence the agency's decision, but this does not insulate either from disclosure).

The City, and ultimately the public, have a very strong interest in disclosure of the Collins Report, the summary and the related report documents. The City's July 30, 1990, letter raised very serious allegations of NMFS employee misconduct respecting the performance by NMFS of its statutory duties. The City and the public have a strong interest in knowing, and a statutory right to know, how and why NMFS acted as it did in the discharge of its statutory duties. As the Supreme Court explained in discussing another exemption under the Act:

> [T]he basic purpose of [the FOIA is] "to open agency action to the light of public scrutiny" ... [and] "create a broad right of access to official information." ... This basic policy of "full agency disclosure unless information is exempted under clearly delineated statutory language," ..., indeed focuses on the citizen's right to be informed about "what their government is up to." *Official Information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose....*

**1334**

*U.S. v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 772–74, 109 S.Ct. 1468, 1481–82, 103 L.Ed.2d 774 (1988) (emphasis added) (discussing FOIA's Exemption 7(c)). (citations omitted). This logic applies with equal, if not greater, force to the Collins Report, the summary and the related report documents.

The court does not suggest that the Collins Report and the summary of it are either correct or dispositive of the allegations raised by the City. However, the City and the public are entitled to know what they show about what the NMFS was "up to" in carrying out the policy and taking the official agency actions which are the subject of the investigation reflected in the Collins Report and the summary. The related report documents provide a different perspective on that point. All are disclosable because neither the Act nor the decisions interpreting it provide an exemption from disclosure.

### C. The "Miscellaneous" Documents

Because these "miscellaneous documents" contain no opinions or recommendations on policies not yet adopted or decisions not yet made by NMFS, they are neither pre-decisional nor deliberative. As discussed above, inasmuch as these documents address the questions and allegations raised in the City's July 30, 1990, letter, they are post-decisional and hence not protected from disclosure by Exemption 5.

■ Document 1 is a briefing paper addressing the effect of the Coastal Zone Management Act (CZMA) on the Project. This document has already been released in part to the City. The text withheld is a statement of the NOAA's policy on the application of the CZMA to the Project, and is neither pre-decisional nor deliberative. Moreover, the part of the document previously disclosed reflects what is contained in the part withheld. Accordingly, the entire document should be disclosed.

Document 5 consists of NMFS's comments on the adequacy of the mitigation plans submitted to the Corps during the permitting process. Inasmuch as the document comments on NMFS policy which already had been adopted the document is neither pre-decisional nor deliberative and should be disclosed.

Document 47 is a cover memorandum from Andrew Kemmerer to William Fox, which was attached to the NMFS's Southeast Region's comments on a review of NMFS's position on the Project. With the exception of the last paragraph, this document has been disclosed to the City. The court finds that the last paragraph merely contains comments on NMFS policy as it existed at that time. The comments are neither pre-decisional nor deliberative, and should be disclosed.

Document 51 is entitled "Chronology of NMFS Letters And Memos Related To The City of Virginia Beach, Lake Gaston Project." Most of the text of this document has been disclosed to the City. Except to the extent that portions of this chronology address documents which the court has found to have been properly withheld, the document should be disclosed.

Documents 75 and 76 are memoranda from three experts to Andrew Kemmerer, addressing the relationship between water flow and recruitment of striped bass in the Roanoke–Albemarle watershed. These memoranda, in effect, present the views of the experts on NMFS's position on the City's application for its Project permit. Because the documents comment on a policy position already adopted by NMFS, they are neither pre-decisional nor deliberative and should be disclosed.

■ However, part of Document 7 is subject to disclosure. Document 7 is a briefing paper on the effects of water withdrawal on the striped bass population in the Roanoke River Basin. This document also has been previously released in part to the City. The portions withheld address briefs to be filed by the Department of Justice in litigation over the Project. As such, the court considers the withheld parts

to be work-product and exempt from disclosure for that reason.[20]

No claim of privilege appears to have been advanced for documents 57 and 72, and *in camera* review has failed to reveal that they are drafts or copies of documents for which an exemption has been claimed or sustained. The Act places the burden on the agency to establish that an exemption precludes disclosure. *See, e.g., Ethyl Corp. v. EPA,* 478 F.2d 47, 49 (4th Cir. 1973). That burden clearly is not met when the agency fails to articulate which exemption it is claiming for a document. Moreover, these two documents do not fall within the scope of the deliberative process exemption claimed for most of the disputed documents. Document 57 is a letter from Andreas Mager to an individual who is not a party to this litigation, which is neither deliberative nor pre-decisional. Document 72 is a handwritten memo discussing Kevin Collins' investigation, and is not within the scope of the privilege for the reasons previously articulated. Accordingly, documents 57 and 72 should be disclosed in their entirety.

### Conclusion

For the reasons set forth above, the documents in Category A, Category B and, except as provided otherwise, Category C must be disclosed. The documents as to which NMFS asserted the work-product privilege were properly withheld from disclosure because they are covered by Exemption 5. NMFS is not required to disclose those documents.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

**20.** *See generally* pp. 1327–1328, *supra.*